**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **JOSEPH J. L.,[1]** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **No. 3:20-CV-621-MAB[2]** |
| | ) | |
| **COMMISSIONER OF SOCIAL** | ) | |
| **SECURITY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM AND ORDER

In accordance with 42 U.S.C. § 405(g), Joseph J. L. ("Plaintiff") seeks judicial review of the final agency decision denying his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") pursuant to 42 U.S.C. § 423. For the reasons set forth below, the Commissioner's decision is reversed and remanded.

## Procedural History

Plaintiff applied for DIB on September 29, 2014 and for SSI on October 30, 2014 (Tr. 100, 900). Plaintiff's claims proceeded to a hearing before Administrative Law Judge ("ALJ") Stuart T. Janney, who issued an unfavorable decision on November 7, 2017 (Tr. 12-37). Plaintiff filed a complaint in this Court, seeking judicial review of the ALJ's decision (*See* SDIL Case No. 18-CV-2078-DGW). On July 16, 2019, the Court remanded

---

[1] In keeping with the Court's practice, Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. *See* Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

[2] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c).

Plaintiff's claims for rehearing and reconsideration (*Id.*). On remand, the ALJ held a subsequent hearing and issued another unfavorable decision on March 19, 2020 (Tr. 2506-40). Plaintiff did not file exceptions with the Appeals Council pursuant to 20 CFR § 404.984, and the ALJ's decision became final on May 19, 2020. Plaintiff filed a timely Complaint in this Court on June 26, 2020 (Doc. 1).

## Issues Raised by Plaintiff

Plaintiff argues the ALJ: (1) failed to comply with the law of the case with respect to his interpretation of MRI evidence of Leonard's lumbar spine; and (2) erroneously weighed the opinion evidence.

## Applicable Legal Standards

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes and regulations.[3] Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a).

To determine whether a claimant is disabled, the ALJ considers the following five questions in order. 20 C.F.R. § 416.920(a)(4). The first question is whether the claimant is presently engaged in substantial gainful activity? *Id.* If the answer is yes, then the

---

[3] The statutes and regulations pertaining to DIB are found at 42 U.S.C. § 423, *et seq.*, and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, *et seq.*, and 20 C.F.R. pt. 416. As is relevant to this case, the DIB and SSI statutes and regulations are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, of the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

claimant is not disabled regardless of their medical condition, their age, education, and work experience. *Id.* at § 416.920(a)(4)(i), (b). If the answer is no, and the individual is not engaged in SGA, the analysis proceeds to question two. *Id.* at § 416.920(a)(4).

At question two, the ALJ considers whether the claimant has a medically determinable physical or mental impairment, or a combination of impairments, that is "severe" and expected to persist for at least twelve months? 20 C.F.R. § 416.920(a)(4)(ii), 416.909. If the answer is no, then the claimant is not disabled. *Id.* at § 416.920(c). If the answer is yes, the analysis proceeds to question three. *Id.* at § 416.920(a)(4).

At question three, the ALJ must determine whether the claimant's severe impairments, singly or in combination, meet the requirements of any of the "listed impairments" enumerated in the regulations. 20 C.F.R. § 416.920(a)(4)(iii). *See also* 20 C.F.R. Pt. 404, Subpt. P, Appendix 1. (list of impairments). A claimant who meets the requirements of a "listed impairment" is deemed disabled. 20 C.F.R. § 416.920(d). For claimants who do not meet the requirements of a "listed impairment," the ALJ must then determine the claimant's residual functional capacity ("RFC"). *Id.* at § 416.920(e). A claimant's RFC is simply the most the claimant can still do despite their functional limitations and restrictions caused by their physical or mental impairments. 20 C.F.R. § 404.1545(a)(1).

Then at step four, the ALJ must determine whether the claimant retains the RFC to continue performing their past work. 20 C.F.R. § 416.920(a)(4)(iv). If the answer is yes, then the claimant is not disabled. *Id.* at § 416.920(a)(4)(iv), (f). If the answer is no, the analysis proceeds to the fifth and final step, where the burden shifts to the commissioner

to show whether, based on the claimant's RFC, there are sufficient numbers of other jobs in the local or national economy that the claimant can perform. *Id.* at § 416.920(a)(4)(v). If the answer is yes, then the claimant is not disabled. *Id.* at § 416.920(g). If the answer is no, the claimant is found disabled. *Id.*

It is important to recognize that the scope of judicial review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether Plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). The Supreme Court defines substantial evidence as, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted). In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010). "[W]e will reverse only if the record compels a contrary result." *Deborah M. v. Saul*, 994 F.3d 785, 788 (7th Cir. 2021) (citation and internal quotation marks omitted).

**The ALJ's Decision**

Following remand from this Court, the ALJ found Plaintiff met the insured status requirements through September 30, 2009 and has not engaged in substantial gainful activity since his alleged onset date of October 15, 2007 (Tr. 2511). Plaintiff had no severe medically determinable impairments and the non-severe impairment of anxiety prior to September 30, 2009 (Tr. 2512). Plaintiff has the following severe impairments since the October 30, 2014 protective filing date for his Title XVI claim: degenerative disc disease; osteoarthritis; coronary artery disease with an arrhythmia; hypertension; hyperlipidemia; diabetes mellitus with neuropathy; level one obesity; and headaches (*Id.*). The ALJ determined the following impairments to be non-severe: unspecified lung changes of an unspecified nature; gastroesophageal reflux disease ("GERD"); carpal tunnel syndrome; dysthymic disorder; depressive disorder; anxiety; panic disorder; history of alcohol abuse; and successfully treated squamous cell carcinoma of the right true vocal cord (*Id.*).

According to the ALJ, Plaintiff has mild limitations in his ability to understand, remember, or apply information and in his ability to concentrate, persist, or maintain pace (Tr. 2514). Plaintiff has no limitations in his ability to interact with others and to adapt and manage himself (*Id.*). Plaintiff does not have an impairment or combination of impairments that met or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (Tr. 2515-18).

The ALJ found Plaintiff has the RFC to perform light work as defined by 20 C.F.R. § 404.1567(b), subject to the following exceptions/abilities: he can lift, carry, push and pull twenty pounds occasionally (up to one-third of the workday); sit for six of eight

hours; stand and/or walk two of eight hours; occasionally climb ramps, stairs, ladders, ropes, and scaffolding; and frequently stoop, kneel, crouch, and crawl (Tr. 2518). The ALJ determined these limitations rendered Plaintiff unable to perform any past relevant work (Tr. 2528). Upon consideration of Plaintiff's age at his alleged onset date (32), his marginal education level, and his ability to communicate in English and work, the ALJ found Plaintiff could perform jobs that existed in significant numbers in the national economy (*Id.*). The ALJ relied on testimony from a vocational expert ("VE") to determine that Plaintiff could perform other jobs (Tr. 2529). The ALJ ultimately concluded Plaintiff is not disabled (Tr. 2529).

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary is directed at Plaintiff's arguments.

### 1. Agency Forms

Plaintiff's disability report from November 2014 states he suffers from issues with his lower back, shoulder, and right knee (Tr. 249). Plaintiff's most recent disability report is dated March 2015 (Tr. 284). He indicated that as of August 2014, his condition has worsened and he suffers from additional problems associated with panic attacks, headaches, hip pain, right foot pain, heart problems, neck problems, and diabetes (Tr. 286). According to the disability report, Plaintiff is prescribed aspirin, Brilinta, Lipitor, Losartan, and Microzide for his heart; insulin for diabetes; Vicodin for pain; Xanax for anxiety; and an unknown medication for inflammation (Tr. 291).

Plaintiff's most recent function report is dated January 2015 (Tr. 272). Plaintiff alleges he cannot work due to headaches and severe pain in his shoulders, neck, and legs (Tr. 265). He uses a cane and has difficulty standing, sitting, walking, placing his hands above his head, dressing, bathing, caring for his hair, shaving, feeding himself, and using the toilet (Tr. 265-66). Plaintiff's friends and family assist him with household chores but he can prepare frozen meals for himself (Tr. 267, 271). His hobbies include watching television, but his pain makes it "hard to do" when he has to "sit up or stand up every couple minutes" (Tr. 269). Plaintiff watches his children on the weekends, but they do not "do much" because of his condition (*Id.*). Plaintiff states he can walk about eight feet before he must rest for ten to fifteen minutes (Tr. 270). Plaintiff does not read or write well (*Id.*). He is "upset and depressed" because he can no longer do many things because of his pain (Tr. 272).

### 2.   *Evidentiary Hearing*

ALJ Janney presided over the initial evidentiary hearing in June 2017 (Tr. 40), and the subsequent hearing following remand in February 2020 (Tr. 2543). Plaintiff was represented by counsel at both hearings (Tr. 2543).

At the February 2020 hearing, Plaintiff testified he weighs 286 pounds and lives with his girlfriend and his nineteen-year-old son (Tr. 2549-50). He cannot work due to extreme pain in his back and neck (Tr. 2553). He also experiences pain in his knees, hips, and legs, and has neuropathy, which limits his ability to stand and walk (Tr. 2556-57). Plaintiff must recline or lay down at least half of the day to control his pain (*Id.*). Plaintiff's pain worsened since his functional capacity exam (Tr. 2555).

Plaintiff tries to complete household chores such as placing dishes in the sink and rinsing them off (Tr. 2562). He goes grocery shopping about once a month and uses a power cart (Tr. 2562-63, 2566). Plaintiff cannot sweep, mop, or wash laundry (Tr. 2562).

Plaintiff stated he cannot comfortably ride in a car like he could before his disability (Tr. 2569). He rode in a vehicle from Marion, Illinois to Carbondale, Illinois for twenty-eight minutes and was in tears (Tr. 2570).

Plaintiff has to sit down to dress himself and is cautious when getting in and out of the shower (Tr. 2571-72). He can prepare himself simple meals like sandwiches and hot dogs but cannot prepare a full meal (Tr. 2572).

Plaintiff can sit uncomfortably for about 30 minutes before he has to recline (Tr. 2574). He can stand for about fifteen minutes (Tr. 2575). Plaintiff can walk for eight minutes at a time (Tr. 2577). Plaintiff's pain makes it difficult for him to process conversations (Tr. 2579).

### 3. *Medical Records*

The following summary of Plaintiff's medical records supplements the Court's prior recitation of Plaintiff's medical history and is limited to the issues raised in the parties' briefing.

Plaintiff complained of persistent back pain throughout the relevant period (*See* Tr. 370, 373, 502-505, 964-66, 1692-94), for which he was prescribed pain medications and muscle relaxers (*See* Tr. 941-60, 1127, 1130, 1132, 1135) and referred to physical therapy (*See* Tr. 1287).

Plaintiff received radiographs of the lumbar spine on June 17, 2014, which found an intact lumbar spine with chronic 15% height loss anterior wedge compression deformity of the T12 vertebra (Tr. 508). Plaintiff received a differential diagnosis of ruptured disc, vertebral fracture, and spasm (*Id.*).

An August 8, 2014 MRI of Plaintiff's lumbar spine showed no abnormalities at T12-L1, L1-2, and L3-4; mild facet arthropathy at T11-12; minimal concentric bulge and mild facet arthropathy at L4-5 that caused moderate narrowing at the opening to each foraminal opening; contact of the left L4 nerve root with the disc bulge near the lateral border of the foramen; and minimal concentric bulge and mild facet arthropathy at L5-S1 causing mild left foraminal narrowing (Tr. 638-39).

On August 8, 2014, an MRI of Plaintiff's lumbar spine showed lower lumbar mild facet arthropathy and minimal degenerative disc disease; no lumbar spine central canal stenosis; minimal thecal sac narrowing at T11-12; moderate L4-5 and mild L5-S1 foraminal narrowing; and that the left L4 nerve root contacts the discus bulge near the foramen, and could be the source for pain (Tr. 638-39).

On December 4, 2014, Plaintiff received an MRI of his cervical spine, which showed c-spine multilevel degenerative disc disease and minor facet arthropathy; multilevel foraminal stenosis (esp. C3-4 and C4-5); mild C3-4 and moderate C4-5 central canal stenosis; and mild adenoid hypertrophy (benign) (Tr. 989).[4]

---

[4] Spinal stenosis is the narrowing of the spinal column or narrowing of the openings where the spinal nerves leave the spinal column. *See* MedlinePlus, Spinal stenosis, https://medlineplus.gov/ency/article/000441.htm (last visiting, March 23, 2022).

On September 25, 2015, Plaintiff received an MRI of the cervical spine that showed (1) multilevel uncovertebral joint and facet joint degenerative changes resulting in multilevel bilateral foraminal stenosis, most severe at the C3-C4 and C4-C5 disc spaces; (2) additional milder degrees of bilateral foraminal stenosis at the C5-C6 and C6-C7 disc spaces; (3) mild central canal stenosis at C3-C4 and C4-C5 disc spaces; and (4) no cord signal abnormalities (Tr. 1240-41).

On October 7, 2015, Plaintiff's Physician Assistant wrote, "I reviewed the EMG findings as well as the MRI scan of the cervical spine. The patient has mild degenerate changes noted at C3-4 and C4-5 levels. There is no significant central canal stenosis noted throughout the cervical spine. There is some mild to moderate foraminal stenosis noted [at] C3-4 and C4-5. However this is not severe enough that would warrant surgical intervention. . .I am recommending evaluation treatment by PM and R to see if we can alleviate his symptoms with further conservative measures" (Tr. 1278).

On March 27, 2017, Plaintiff underwent an x-ray of the lumbar spine, which showed no acute osseous[5] abnormality of the lumbar spine and mild to moderate degenerative disc disease at L4-L5, T12-L1, and T11-T12 (Tr. 2090). An x-ray of Plaintiff's cervical spine from the same date showed (1) no fracture of subluxation and (2) chronic discogenic degenerative disease and facet arthrosis (Tr. 2093).

---

[5] Osseous tissue is tissue that gives strength and structure to bones. It is maintained by bone-forming cells called osteoblasts and cells that break down bone called osteoclasts. National Cancer Institute, *Osseous Tissue*, https://www.cancer.gov/publications/dictionaries/cancer-terms/def/osseous-tissue (last visited March 23, 2022).

On May 15, 2017, Plaintiff received an MRI of his pelvis and lumbar spine due to his complaints of back and bilateral hip pain (Tr. 2474-75).    Impressions    from    the lumbar spine MRI included: (1) very advanced degenerative changes at L4-5 with inflammatory facet arthropathy bilaterally and fluid in the facet joint suggesting instability; (2) left foraminal bulge at L4-5 causing severe left L4 foraminal stenosis when combined with danced facet and ligamentous hypertrophy; and (3) advanced degenerative changes at the lumbosacral junction as well resulting in severe left L5 foraminal narrowing (Tr. 2474). The findings noted, "There has been mild progression of degenerative change as compared to earlier" (Tr. 2475).

On October 9, 2017, Plaintiff underwent an x-ray of the lumbar spine, which showed no acute fracture or listhesis and multilevel degenerative disease (Tr. 2999). It was noted that the x-ray was "[s]imilar in appearance to the MRI performed on 5/15/2017" (*Id.*).

On June 23, 2018, Plaintiff received a CT of the lumbar spine, which showed advanced disc degeneration at T11-12, mild disc degeneration at T12-L1, preserved lumbar intervertebral disc heights, and no lumbar spinal canal (Tr. 3218).

On July 2, 2018, Plaintiff presented to Physician Assistant ("PA") Michael Bryant at Dr. Michael Workman's office with complaints of low back pain and neck pain that he described as "aching, stabbing and burning-type" (Tr. 2950). Plaintiff stated that any movement increased his pain, including sitting, standing, bending, lifting, and walking (*Id.*). Plaintiff's motor exam was normal and he demonstrated 5/5 strength throughout

(Tr. 2953). Plaintiff's gait was non-neurologic and he demonstrated tenderness, pain, and spasm on the lumbar back (Tr. 2953-54). PA Bryant wrote:

> I have personally reviewed the plain film x-rays without flexion extension views dated October 9, 2017. This does show a slight retrolisthesis of L4 top of L5.
>
> Patient also has a previous MRI scan of the lumbar spine dated May 15, 2017 performed at Herrin Hospital. This reveals degenerative changes noted at the L4-5 level with slight retrolisthesis of L4-5 with moderate left foraminal stenosis.
>
> I reviewed the imaging and physical exam findings with patient and son today. I discussed with patient that we will need to obtain new imaging of lumbar spine his imaging is over a year old. I will also have patient undergo x-rays of lumbar spine to include flexion extension view to evaluate for any active instability. The patient is in severe pain in the office today.

(Tr. 2954).

On July 17, 2018, Plaintiff received an MRI of the lumbar spine, which showed: (1) very advanced lower lumbar arthropathy most severe at L4-5 where there is resulting severe bilateral L4 foraminal narrowing; and (2) other mild to moderate degenerative changes (Tr. 2978).

On July 20, 2018, PA Bryant entered notes that he "reviewed the imaging and physical exam findings at case conference today. The MRI scan did not show any focal abnormalities that would be causing his symptoms. Therefore no surgical intervention be warranted at this time. The surgeon would recommend at this time that the patient continue with conservative measures to include physical therapy as well as injection therapy. If the patient is willing to move forward with conservative measures we will be glad to provide a referral" (Tr. 2957).

Throughout October 2018 and February 2019, Plaintiff called Dr. Workman's office and complained of excruciating pain (Tr. 2959-61). Plaintiff requested medication but was offered a referral to see a specialist to assist with pain (*Id.*).

On February 28, 2019, Plaintiff received a CT of the lumbar spine, which showed moderate broad-based disc bulge resulting in mild central canal stenosis at L4-5 and no acute osseous abnormality (Tr. 2986).

On March 18, 2019, Plaintiff presented to Dr. Workman with complaints of gradually worsening back pain in the lumbar spine that radiated to his feet (Tr. 3323). Plaintiff's pain was "moderate" and aggravated by bending, sitting, twisting, and standing (*Id.*). Plaintiff exhibited tenderness and no edema on examination (Tr. 3323-24).

On April 16, 2019, Plaintiff underwent an MRI of the lumbar spine (Tr. 3343-44). The impression included: (1) fairly stable exam with advanced degenerative facet arthropathy in the lower lumbar spine and resulting grade 1 degenerative retrolisthesis at L4-5 with severe bilateral L4 foraminal stenosis; and (2) other mild to moderate degenerative changes (Tr. 3344).

On April 22, 2019, Plaintiff saw Dr. Workman and complained of gradually worsening back pain in the lumbar spine that radiated to his feet (Tr. 3328). The pain was "moderate" and aggravated by bending, twisting, and "position" (*Id.*). During physical examination, Plaintiff exhibited normal muscle tone (Tr. 3333). Dr. workman assessed Plaintiff with chronic midline low back pain with bilateral sciatica and prescribed Plaintiff Norco (Tr. 3334).

On May 6, 2019, Plaintiff presented to PA Bryant for evaluation of back and lower extremity pain and paresthesia (Tr. 3723). PA Bryant noted that Plaintiff was seen the previous year for back pain (*Id.*). "At that time [surgeons] recommended further conservative measures with physical therapy and injection therapy. The patient reports that he is unable to have injection therapy due to allergy to the steroids. He states that the last time he had physical therapy this significantly exacerbate [sic] his pain and therefore refuses to do any additional physical therapy" (*Id.*). Plaintiff described his pain as aching, stabbing, and burning and he also reported paresthesia (*Id.*). Plaintiff stated his pain worsened with standing, bending, and walking (*Id.*). Sitting and forward flexing decreased the pain (*Id.*). Plaintiff exhibited a normal motor exam and 5/5 strength; his gait was non-neurologic, and his physical exam exhibit tenderness over the cervical and lumbar back (Tr. 3727-28). PA Bryant reviewed Plaintiff's MRI of the lumbar spine from April 16, 2019 and noted it showed "slight straightening of the normal lumbar lordosis with no evidence of fracture or subluxation and mild degenerative changes most noted at the L4-5 level" (Tr. 3728). "On axial views there is no significant central or foraminal stenosis with exception L4-5. L4-5 there is a broad-based disk osteophyte complex as well as facet arthropathy causing moderate bilateral foraminal stenosis. When comparing this MRI scan to his previous MRI scan dated July 17, 2018" there is "no significant change in the foraminal stenosis" (*Id.*). Plaintiff was assessed with spondylosis of cervical region without myelopathy or radiculopathy and lumbar spondylosis (Tr. 3729).

Also on May 6, 2019, Plaintiff received an x-ray of his cervical spine, which showed (1) chronic discogenic degenerative disease and facet arthrosis; and (1) one millimeter

retrolisthesis C3 and C4 and one millimeter retrolisthesis C4 on C5 (Tr. 2982-83). An x-ray of Plaintiff's lumbar spine showed minimal L4-L5 disc space narrowing, no instability/listhesis with flexion or extension, and minimal facet arthropathy in the lower lumbar spine (Tr. 2980-81).

On May 10, 2019, PA Bryant wrote that he reviewed Plaintiff's imaging and physical exam findings with surgeons (Tr. 3730). "The patient does have narrowing at L4-5 foraminally. However this is not consistent with his symptoms…We previously offered physical therapy as well as injection therapy. Patient states he is allergic to steroids therefore cannot have any further injections. He also states that physical therapy does not provide any symptomatic relief. Therefore we have no further treatment options for him, however will be glad to assist him with a second opinion" (*Id.*).

On June 10, 2019, Plaintiff saw Dr. Workman and complained of "waxing and waning" pain in his neck, lower back, left hip, right hip, left shoulder, right shoulder, right knee, and left knee (Tr. 3425). Plaintiff's pain was "medium" and associated symptoms included joint swelling and stiffness" (*Id.*). Dr. Workman assessed Plaintiff with chronic midline low back pain with bilateral sciatica, pain of both hip joints, and right hand pain and prescribed Plaintiff Norco (Tr. 3426).

On December 5, 2019, Plaintiff presented to the emergency department at Heartland Regional Medical Center with complaints of chronic pain in his back and right leg (Tr. 3827). Plaintiff exhibited back pain with flexion and extension and pain in high right lower extremely with straight leg raises (Tr. 3828). His extremities were grossly

normal except right leg tenderness (*Id.*). Plaintiff was assessed with sciatica on his right side, administered Toradol and Dilaudid, and discharged (*Id.*).

### 4. *Opinion Evidence*

On December 29, 2014, J. Shawn Owens, OTR/L, completed a fit for work examination upon the request of Dr. Workman (Tr. 584). The form listed several activities, followed by the categories, "infrequent," "occasional," "frequent," and "constant" (Tr. 588). Mr. Owens wrote Plaintiff was "unable to perform" the following activities: barrier lift, back lift, leg lift, and overhead lift (*Id.*). Mr. Owens wrote "sedentary" under the "infrequent" category with respect to the following activities: power lift, shoulder life, and two hand carry (*Id.*). Mr. Owens wrote "light" under the "infrequent" category with respect to one hand carrying (*Id.*). Mr. Owens wrote "heavy" under the "occasional" category with respect to the "walking push/pull" activity (*Id.*). Mr. Owens stated plaintiff could push/pull while standing fifteen horizontal force pounds (*Id.*). Mr. Owens opined Plaintiff could infrequently bend, squat, and kneel and occasionally stair and ladder climb (*Id.*). Mr. Owens then stated Plaintiff could occasionally sit, stand, walk, forward reach, overhead reach, and critically balance (*Id.*).

On April 10, 2015, Dr. Workman completed a Social Security form entitled, "Medical Sources Statement of Ability to do Work-Related Activities (Physical)" (Tr. 1110). Dr. Workman opined Plaintiff could lift and carry less than ten pounds; stand and/or walk less than two hours in an eight-hour workday; sit less than six hours in an eight-hour workday; and was limited in his upper and lower extremities with respect to pushing and/or pulling (Tr. 1110-11). Plaintiff could never climb, kneel, crouch, crawl, or

stoop and could only occasionally balance (Tr. 1111). Plaintiff could only occasionally reach, handle, finger, and feel (Tr. 1112). Dr. Workman states the limitations were caused by Plaintiff's hip, back, neck, knee, and shoulder pain, and his diabetes (Tr. 1111-13).

On August 14, 2015, state-agency consultant Dr. Sandra Bilinsky conducted a record review to determine Plaintiff's functional capacity (Tr. 120). Dr. Bilinsky reviewed Dr. Workman's Medical Source Statement and found the imaging exams did not support Dr. Workman's opinions (*Id.*). Dr. Bilinsky opined Plaintiff was capable of performing light work (Tr. 123).

On February 6, 2017, Dr. Workman completed another Medical Source Statement of Ability to Do Work-Related Activities (Physical) (Tr. 2496). Dr. Workman opined Plaintiff could stand and/or walk less than two hours in an eight-hour workday, sit less than six hours in an eight-hour workday, and was limited in pushing and/or pulling (Tr. 2496-97). According to the statement, Plaintiff could never climb, kneel, crouch, crawl, or stoop but could frequently balance (Tr. 2497). Dr. Workman stated Plaintiff was limited in reaching, handling, fingering, and feeling but Dr. Workman also stated Plaintiff could "constantly" engage in reaching, handling, fingering, and feeling (Tr. 2498). Dr. Workman cited a "fit for work" completed by a physical therapist as support for his findings (*See* Tr. 2496-98).

On December 10, 2019, Dr. Workman completed a Residual Functional Capacity Report in which he opined Plaintiff had not significantly improved since the December 29, 2014 fit for work evaluation and that Dr. Workman would not anticipate any significant improvement if Plaintiff were to undergo another evaluation (Tr. 3780).

## Analysis

Plaintiff argues the ALJ's decision is erroneous because the ALJ improperly interpreted Plaintiff's MRI records using his own lay opinion. In a related argument, Plaintiff contends the ALJ improperly relied on the opinion of state agency consultant Dr. Bilinsky, because the opinion pre-dated the MRI records in question. Plaintiff asserts the ALJ should have afforded controlling weight to the opinions of his treating physician, Dr. Workman. These issues substantially overlap and will be addressed together.

When evaluating the medical record, "ALJs are required to rely on expert opinions instead of determining the significance of particular medical findings themselves." *Moon v. Colvin*, 763 F.3d 718, 722 (7th Cir. 2014). "ALJs must not succumb to the temptation to play doctor and make their own independent medical findings." *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996). However, ALJs are "not only allowed to, but indeed must, weigh the evidence and make appropriate inferences from the record." *Seamon v. Astrue*, 364 F. App'x 243, 247 (7th Cir. 2010). As part of this analysis, ALJs must weigh all of the medical opinion evidence pursuant to 20 C.F.R. § 416.927(c),[6] which instructs ALJs to consider the length, nature, and extent of the treatment relationship, the frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion. *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009). Under the same regulation, ALJs must give a treating physician's opinion controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques

---

[6] Plaintiff filed his claim before March 27, 2017 and, thus, § 416.927 governs the ALJ's decision. *See* 20 C.F.R. § 416.927.

and is not inconsistent with the other substantial evidence in the record. 20 C.F.R. § 416.927(c)(2).

Here, Plaintiff underwent an MRI of the lumbar spine in May 2017 (Tr. 2474-75). The state agency medical consultant, Dr. Bilinsky, rendered her opinion roughly two years before Plaintiff received the MRI and, thus, did not consider the evidence when opining on Plaintiff's RFC. Dr. Bilinsky ultimately found Plaintiff could perform light work. In the ALJ's initial 2017 decision, the ALJ afforded Dr. Bilinsky's opinion "little weight" because her opinion pre-dated the 2017 MRI (Tr. 2606). Instead, the ALJ concluded for himself that the 2017 MRI suggested Plaintiff "would have a more restrictive functional capacity, but not more restrictive than sedentary" (*Id.*).

On review, this Court determined the ALJ's determination was erroneous because he interpreted the significance of the 2017 MRI without the aid of an expert opinion (Tr. 2652-54). The Court noted there were "obvious differences between the 2014 and 2017 MRIs" and remanded the case to the Commissioner for further proceedings, consistent with the principle that ALJs are not qualified to interpret medical evidence themselves (*Id.*). However, the Court emphasized that the "Court is not a medical expert qualified to determine the significance of radiology reports either" (Tr. 2653).

On remand, the ALJ gave "significant weight" to Dr. Bilinksy's 2015 opinion (Tr. 2526). The ALJ explained, "The undersigned acknowledges the conclusions of Dr. Bilinsky are remote at this time. However, although they are remote, laboratory findings and medical signs [she] considered do not differ markedly from those rendered by more recent examinations" (Tr. 2525). The ALJ specifically noted that Plaintiff's 2017 MRI

showed "mild progression of degenerative change as compared to earlier" (Tr. 2475). The ALJ concluded "the new evidence does not alter [Dr. Bilinsky's] analysis as it also shows little progression since then" (Tr. 2523).

The Seventh Circuit has found that an ALJ may rely on an outdated assessment when "MRI evidence post-dating the state agency consultant's report show[s] only mild changes in the claimants' respective conditions." *Kemplen v. Saul*, 844 F. App'x 883, 887 (7th Cir. 2021), *as amended on reh'g in part* (June 21, 2021) (collecting cases) (citing *Keys v. Berryhill*, 679 F. App'x 477 (7th Cir. 2017); *Olsen v. Colvin*, 551 F. App'x 868 (7th Cir. 2014)). However, an ALJ must seek an additional medical opinion if evidence that post-dates the assessment is "potential[ly] decisive." *Kemplen*, 844 F. App'x at 887. The determinative question is "whether the new information changed the picture so much that the ALJ erred by continuing to rely on an outdated assessment by a non-examining physician and by evaluating himself the significance of the subsequent report." *Id.* (internal quotations and alterations omitted).

The circumstances of this case present a close call. On one hand, Plaintiff's treatment providers offered him the same conservative treatment for his back pain before and after the 2017 MRI. *See* Tr. 1278 (October 2015 record recommending evaluation "to see if we can alleviate his symptoms with further conservative measures"); Tr. 2957 (July 2018 record stating no surgical intervention was warranted and recommending "conservative measures"); Tr. 3723 (May 2019 record recommending "further conservative measures with physical therapy and injection therapy").

On the other hand, the 2017 MRI unequivocally states Plaintiff's condition worsened following Dr. Bilinsky's opinion. However, the ALJ determined the 2017 MRI did not affect the credibility of Dr. Bilinsky's 2015 opinion because the MRI showed "only mild progression of degenerative change" (Tr. 2523). The ALJ accurately summarized the MRI findings (*see* Tr. 2475), and admittedly, "mild progression" sounds unremarkable to the lay ear. However, neither the Court nor the ALJ is qualified to interpret the medical significance of the phrase. *See, e.g., Dolan v. Colvin*, 2016 WL 6442226, at *4 (N.D. Ill. Nov. 1, 2016) ("although this second MRI report refers in places to 'mild' findings, such as 'mild lumbar canal stenosis' and '[m]ild spondylotic changes,' these are medical terms that are not obvious to a layperson, and thus need interpretation by an expert."). Although the ALJ thoroughly summarized the medical evidence and offered detailed explanations of his reasoning, there is no medical opinion in the record that sheds light on the significance of the 2017 MRI. Given the five-year gap between Dr. Bilinsky's opinion and the ALJ's decision, and the unknown but potential significance of the 2017 MRI, the ALJ erred in drawing conclusions from the technical medical evidence without relying on a medical expert. The Court reiterates that it offers no opinion on the ultimate question of disability or on the weight of the medical evidence. Although remand is warranted on this basis, alone, the Court will also address Plaintiff's argument concerning the ALJ's analysis of Dr. Workman's opinion.

Plaintiff contends the ALJ erred in assessing the opinion of his treating physician, Dr. Workman. On remand, the ALJ noted Dr. Workman was Plaintiff's "long-time treating source" but he afforded Dr. Workman's opinions "little weight" (Tr. 2527). The

ALJ initially noted that Dr. Workman's assessment was based on a physical therapist's fit for work examination (Tr. 2526). The ALJ stated the examination does not appear to use a "known protocol" for evaluating RFC, was internally inconsistent, was based on the therapist's observations of Plaintiff that lasted "for a few minutes," and was not based on a simulation of an eight-hour workday (*Id.*).

Also, the ALJ stated Dr. Workman's own notes show he reviewed Plaintiff's imaging and physical exam findings and found the evidence did not show any focal abnormalities that would cause his symptoms (Tr. 2956-57). Further, the ALJ stated the clinical findings did not show weakness, muscle loss, or loss of range of motion in multiple examinations (Tr. 2954, 2968-70). Finally, the ALJ noted that Dr. Bilinsky discounted the evaluation of the physical therapist that Dr. Workman relied upon because the evidence did not support Dr. Workman's opinions (Tr. 2527).

Plaintiff primarily contends that the ALJ erred in rejecting the fit for work examination conducted by Plaintiff's physical therapist and relied upon by Dr. Workman. Plaintiff unsuccessfully raised this argument in his prior complaint to the Court, where it was held that the ALJ did not err in his analysis of the examination (Tr. 2655-56). Plaintiff's argument is no more convincing this time around. The ALJ articulated detailed reasons of why he rejected the fit for work examination, which included internal inconsistencies. The ALJ is only required to "minimally articulate" his reasons for rejecting a treating physician's opinion, which is "a very deferential standard" that the Seventh Circuit has deemed "lax." *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008).

Nonetheless, the ALJ offered an additional and thorough analysis that implicitly addresses all the relevant factors set out in 20 C.F.R. § 416.927. *See Schreiber v. Colvin*, 519 F. App'x 951, 959 (7th Cir. 2013) (while the ALJ "did not explicitly weigh each factor in discussing" the treating physician's opinion, "his decision makes clear that he was aware of and considered many of the factors, including" treatment relationship, consistency with the record as a whole, and supportability); *Henke v. Astrue*, 498 F. App'x 636, 640 n.3 (7th Cir. 2012) ("The ALJ did not explicitly weigh every factor while discussing her decision to reject Dr. Preciado's reports, but she did note the lack of medical evidence supporting Dr. Preciado's opinion, and its inconsistency with the rest of the record. This is enough."). For instance, the ALJ recognized Dr. Workman's "long-time" treatment relationship with Plaintiff but noted the inconsistency between Dr. Workman's opinions and other evidence in the record, including Dr. Workman's own records (*see* Tr. 2526). Particularly, the ALJ cited a July 20, 2018 record from the Physician Assistant in Dr. Workman's office, which stated, "I reviewed the imaging and physical exam findings at case conference today. The MRI scan did not show any focal abnormalities that would be causing [Plaintiff's] symptoms" (Tr. 2956-57). The ALJ's opinion ultimately built an accurate and logical bridge from the evidence to his decision to not give controlling weight to Dr. Workman's opinions. However, the ALJ erred in drawing conclusions from the 2017 MRI without the aid of expert opinion, which requires reversal and remand.

## Conclusion

The Commissioner's final decision denying application for social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing

and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. § 405(g).

The Clerk of Court is directed to enter judgment in favor of defendant.

**IT IS SO ORDERED.**

**DATE: March 23, 2022**

**s/ Mark A. Beatty**
**MARK A. BEATTY**
**United States Magistrate Judge**